

CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 25, 2019**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | **CASE NO. 18-31575-BJH** |
| | § | |
| **HARD-MIRE RESTAURANT** | § | **(Chapter 11)** |
| **HOLDINGS, LLC f/d/b/a** | § | |
| **CAMPUZANOS DALLAS, LLC,** | § | Related to ECF No. 57 |
| | § | |
| Debtor. | § | |

### MEMORANDUM OPINION OVERRULING, IN PART, THE
### DEBTOR'S OBJECTION TO CLAIM NO. 6 AND ALLOWING
### <u>FORMER EMPLOYEE'S FLSA CLAIM IN THE AMOUNT OF $19,357.64</u>

## I.      INTRODUCTION

Hard-Mire Restaurant Holdings, LLC, f/d/b/a Campuzanos Dallas, LLC (the "**Debtor**"), is

a reorganized debtor under Chapter 11 of the Bankruptcy Code. The Debtor, at all relevant times,

operated a Mexican food restaurant in Dallas, Texas known as "Campuzanos." Prepetition, the

Debtor employed Jose Jorge Dominguez ("**Claimant**" or "**Mr. Dominguez**") for about 16 months,

as either a cook or a kitchen manager—depending upon whose version of the facts one believes—paying him weekly on a salary basis. Mr. Dominguez did not complain about his pay while employed by the Debtor, but he sued the Debtor in federal court a few months after he was terminated, alleging that he had worked significant overtime on a weekly basis, for which he was never paid. He alleged that **$101,253.75** in damages was owing to him, arising from the Debtor's failure to pay him overtime wages in accordance with the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (the "**FLSA**"). Before the lawsuit could proceed to trial, the Debtor filed its Chapter 11 bankruptcy case. Mr. Dominguez then filed a proof of claim based on his lawsuit, to which the Debtor objected.[1] The court held a hearing on the Objection on June 12, 2019 (the "**Hearing**"). The court heard testimony from seven witnesses (plus considered certain deposition excerpts submitted into evidence) and also allowed approximately a dozen documents into evidence. For the reasons explained below, the court will overrule the Objection, in part. Specifically, the court will allow Claim No. 6 in the reduced amount of **$19,357.64, comprised of $9,678.82 in unpaid overtime wages and $9,678.82 in statutory liquidated damages, plus reasonable attorneys' fees to be determined in a separate opinion**. This constitutes the court's findings and conclusions in support of the court's ruling, as required by Rule 7052 and 9014 of the Federal Rules of Bankruptcy Procedure in a contested matter.

## II.    JURISDICTION, VENUE, AND STATUTORY AND CONSTITUTIONAL AUTHORITY

Subject matter jurisdiction exists in this bankruptcy proceeding pursuant to 28 U.S.C. § 1334(b), and this court has authority to exercise bankruptcy subject matter jurisdiction pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33) for the Northern District of Texas dated August 3, 1984. The Objection

---

[1] Debtor's Objection to Proof of Claim 6 [ECF No. 57] (the "**Objection**").

presents a "core" matter under 28 U.S.C. §§ 157(b)(2)(B), and this court has statutory and Constitutional authority to enter final orders and judgments in this proceeding.

## III.    FINDINGS OF FACT

The Debtor filed its Chapter 11 case on May 4, 2018 (the "**Petition Date**").   Mr. Dominguez worked for the Debtor for approximately 67 weeks, from mid-July 2014 through the end of October 2015.[2]  Mr. Dominguez was terminated from his job near the end of October 2015 for reasons that are not relevant to this opinion.

After he was terminated, Mr. Dominguez sued the Debtor, its principal, and an affiliated entity in the District Court for the Northern District of Texas on January 18, 2016, *Dominguez v. Kincaid Inc.*, Civ. Case No. 3:16-cv-00143-L (the "**Lawsuit**").   Before the Lawsuit could proceed to trial, the Debtor filed its bankruptcy case.

It its Schedule E/F filed with the court on May 25, 2018, the Debtor lists Mr. Dominguez as holding two claims, each marked as "contingent" and in an unknown amount.[3]

Mr. Dominguez timely filed Claim No. 6 on August 23, 2018 (the "**Claim**").   Attached to the Claim was a copy of the 8-page "Complaint Under 29 U.S.C. §§ 201- 216 Overtime Violations" that had been filed with the District Court, which contained information regarding Mr. Dominguez's alleged claim and the resulting damages.  The face of the Claim asserted $101,253.75 as the amount owing for "wages and liquidated damages − see attached FLSA suit."

The Debtor filed its one-and-a-half-page Objection to the Claim on March 11, 2019, merely arguing that "*[t]he Debtor denies that any violation of the Fair Labor Standards Act occurred*

---

[2] Debtor's Ex. A at 1 (reflecting the last paycheck received by Mr. Dominguez).

[3] Schedule E/F [ECF No. 14] at 30.  The first scheduled claim lists Mr. Dominguez's home address, while the second scheduled claim lists his attorney's address.  The scheduled claims are otherwise identical.

*as to Mr[.] Dominguez*" and "*[t]he Debtor objects to [the] claim of Dominguez until this court makes a determination of the amount if any owed to Dominguez.*"[4]

Mr. Dominguez responded to the Objection on April 10, 2019 [ECF No. 63] (the "**Response**"). The Response complains, among other things, that the Objection wholly fails to comply with Local Bankruptcy Rule 3007-1, which requires that every objection to a claim "…shall state with particularity the basis for the objection."[5] The Response also provided significant briefing to the court regarding the FLSA.

The court then held the Hearing, after which it took the matter under advisement.

At the Hearing, the parties stipulated to the following facts:[6] (a) the court has jurisdiction over this case; (b) Mr. Dominguez was an employee of Campuzanos Dallas, LLC;[7] (c) Campuzanos Dallas, LLC was a covered enterprise subject to the FLSA during the time that Mr. Dominguez was employed by it; and (d) Mr. Dominguez was employed by Campuzanos Dallas, LLC during the years 2014 and 2015.

At the Hearing, it became clear for the first time that the Debtor's sole defense to the Claim was that Mr. Dominguez was exempt from the overtime pay requirements of the FLSA because, under 29 U.S.C. § 213, Mr. Dominguez was a *salaried executive employee—i.e.,* a *manager of Compuzanos' kitchen*. Mr. Dominguez disagreed, arguing that he was merely a cook and, as such, was entitled to overtime pay.

---

[4] Objection ¶¶ 5-6 (emphasis added).

[5] L.B.R. 3007-1(a).

[6] *See* Claimant's Ex. 7 (Joint Pre-Trial Order from the District Court Lawsuit) at 4. *See also* Claimant's Ex. 6 (Responses 9-13 of Requests for Admission).

[7] There is no dispute that the Debtor was operating under the name Compuzanos Dallas, LLC during all times relevant to the Objection.

The evidence on this point was that Mr. Dominguez was hired July 19, 2014 at a weekly salary of $550 per week.[8] All documentary evidence reflects that he was a cook.[9] He received a raise to $650 per week on September 13, 2014.[10] Then another raise to $700 per week on March 21, 2015, where his salary stayed until he was terminated near the end of October 2015.[11] The court notes anecdotally that if Mr. Dominguez worked 40 hours per week (which he states he did not—he estimates he worked on average 71 hours per week during his entire employment with the Debtor), then his hourly pay rate would have been: (a) **$13.75** per hour from July 19, 2014-September 6, 2014 ($550 per week divided by 40 hours); (b) **$16.25** per hour from September 13, 2014-March 14, 2015 ($650 per week divided by 40 hours); and (c) **$17.50** per hour from March 21, 2015 until his termination in October or November 2015 ($700 per week divided by 40 hours). These facts alone might suggest that Mr. Dominguez was, in fact, no ordinary cook because—by comparison—the other cooks at the Debtor's restaurant were earning on average between **$8 and $11** per hour (and, additionally, were rarely if ever working overtime).[12] On the other hand, if Mr. Dominguez truly worked 71 hours per week, then his hourly wage would have been: (a) **$7.75** per hour from July 19, 2014-September 6, 2014 ($550 per week divided by 71 hours); (b) **$9.15** per hour from September 13, 2014-March 14, 2015 ($650 per week divided by 71 hours); (c) **$9.86** per hour from March 21, 2015 until his termination in October or November 2015 ($700 per week divided by 71 hours). Mr. Dominguez is seeking overtime for 67 weeks (he was terminated in the middle of his 68th week).

---

[8] Debtor's Ex. A.

[9] Debtor's Exs. A & B; Claimant's Exs. 1, 2, 3 at 4, 4 at 8-9, & 5.

[10] Debtor's Ex. A.

[11] *Id.*

[12] Debtor's Ex. B at 4-7; Claimant's Ex. 3 at 4-5 & 5 at 8-11.

The court finds that, of the 67 weeks Mr. Dominguez worked for the Debtor, he worked eight weeks at the salary of $550 per week (total $4,400 of pay); he worked 27 weeks at the salary of $650 per week (total of $17,500 of pay); and he worked 32 weeks at the salary of $700 per week (total of $22,400 of pay).[13] This totals **$44,350 of aggregate pay over 67 weeks**. If one divides $44,350 of aggregate pay over 67 weeks, this yields an average salary per week of $661.94 per week. If one divides $661.94 salary per week by a 71-hour workweek, this would reflect an effective hourly rate of **$9.32** per hour over Mr. Dominguez's entire employment term with the Debtor. But if Mr. Dominguez falls under FLSA's ambit for overtime, he should have received additional compensation for all hours worked in excess of 40 hours each week (*i.e.*, 31 hours each week). "Time-and-a-half" of a $9.32 hourly rate would be $13.98 per hour for 31 hours each week ($4.66 per hour more than Mr. Dominguez received). Thus, if Mr. Dominguez worked 31 hours of overtime for 67 weeks, this would equal 2,077 hours of overtime, which should have received $4.66 per hour more than what Mr. Dominguez received (and 2,077 times $4.66 equals $9,678.82).[14] More on this computation later—which is significantly different from Mr. Dominguez's proof of claim's monetary assertion.

Many witnesses credibly testified that a Mr. Jorge Vazquez (who did not testify; it was represented that he left the restaurant within about 30 days after Mr. Dominguez left) was the manager in charge of the kitchen (doing all of the hiring and firing of kitchen employees and

---

[13] Debtor's Ex. A.

[14] *See Singer v. City of Waco*, 324 F.3d 813, 822-23 (5th Cir. 2003) (fire fighters argued that the district court had used the wrong divisor in computing its legally required time-and-a-half overtime, by including overtime hours in the divisor; they argued that, for all work periods at issue, the court should have divided by the maximum number of non-overtime hours that fire fighters worked; Fifth Circuit noted that, in *Lee v. Coahoma County, Mississippi*, 937 F.2d 220 (5th Cir. 1991), corrected by *Lee v. Coahoma County, Mississippi*, 37 F.3d 1068, 1069 (5th Cir. 1993), it had explained that, in determining the regular rate of pay, the district court should divide the work period salary "by the number of regular hours which may be worked in that work period" and it did not state that "regular hours" could only include non-overtime hours; rather, the Fifth Circuit stated that the term "regular hours" is more appropriately defined as the hours normally and regularly worked by an employee. Thus, the district court did not err in calculating the fire fighters' regular rate by dividing their work period salary by both non-overtime and overtime hours.).

granting days off when employees requested it), and Mr. Dominguez was second-in-charge of the kitchen whenever Mr. Vazquez was not there. In addition to Mr. Vasquez, Compuzanos also employed a separate, front-of-the-restaurant manager named Barto Morales while Mr. Dominguez was employed at the restaurant. The evidence indicated that the kitchen manager, Mr. Vazquez, earned $1,300 per week—obviously significantly more than Mr. Dominguez.[15] The evidence reflected that Mr. Dominguez had some responsibilities beyond that of a typical cook. He dealt with vendors some (ordering food), he consulted regarding menu items and created some recipes, and, again, he was second-in-charge if Mr. Vazquez was not there. Mr. Dominguez credibly testified that he never hired or fired anyone himself. Mr. Dominguez was one of four employees who had keys to the restaurant. Mr. Dominguez is 56-years-old and has been a cook for 34 years.

The restaurant's hours were 11:00 a.m. to 10:00 p.m. Sunday through Thursdays and 11:00 a.m. to 11:00 p.m. Fridays and Saturdays, although at some unspecified time the restaurant started weekend brunch and began opening at 10:00 a.m. or 10:30 a.m. on Saturdays and Sundays. Thus, for most of the time Mr. Dominguez worked at the restaurant, the restaurant was open from 79 to 81 hours per week. Mr. Dominguez credibly testified that the restaurant might have 300 or so patrons on weekends and he was cooking all the time. Mr. Dominguez credibly testified that he came in around 8:00 a.m. to prepare in the kitchen each day before the restaurant opened and he worked until 2:00 p.m. Then he would come back at 5:00 p.m. and work until about 45 minutes to an hour after the restaurant closed. He was off on Tuesdays. Using this data, it is conceivable that Mr. Dominguez could have worked 71 hours per week on average—but there are no employer records to persuasively establish this.

---

[15] Debtor's Ex. B at 15.

The court finds by a preponderance of the evidence that Mr. Dominguez did likely work an average of 71 hours per week. The current General Manager of the Debtor (who was not working at Compuzanos when Mr. Dominguez worked there) testified that he did not know how many hours Mr. Dominguez worked (although he noted that there were many cooks there and he did not believe anyone could work such grueling hours). And Mr. Barto Morales (the manager of the front of the restaurant who was working back when Mr. Dominguez worked at the restaurant) said he did not think that Mr. Dominguez could have worked 70+ hours per week, but he did not seem to have any way of being certain. Nevertheless, Mr. Dominguez adamantly testified that he worked 71 or more hours per week, and other witnesses testified that cooks came in early and left after the restaurant closed.

In summary, almost the entirety of the evidence at the Hearing centered around whether Mr. Dominguez was a mere cook or salaried executive employee. There was little evidence submitted regarding Mr. Dominguez actual work hours, other than his own testimony. The court finds that Mr. Dominguez was a cook with more responsibilities than most of the others at the restaurant, but he was not a managerial employee that would be exempt from FLSA overtime pay requirements. The court also finds that the preponderance of evidence reflected that Mr. Dominguez likely worked an average of 71 hours per week and is entitled to overtime backpay.

## IV.    LEGAL ANALYSIS

As mentioned earlier, the Debtor's Objection argued, in two short pages without any specific detail or support, that the Debtor is not liable to Mr. Dominguez because no violation of the FLSA occurred. At the Hearing, the Debtor elaborated on its argument for the first time, explaining that its defense revolves around its theory that Mr. Dominguez was exempt from the overtime pay requirements of the FLSA because, under 29 U.S.C. § 213, he was a ***salaried executive employee***—*i.e.,* a ***manager of Compuzanos' kitchen***.

Mr. Dominguez vehemently disagreed, arguing that he was merely a cook and, as such, was entitled to overtime pay. He also argued that the Objection should be overruled because the Claim was deemed allowed by the Chapter 11 Plan confirmed by this court, or, alternatively, Mr. Dominguez can establish the validity of his claim.[16]

This Memorandum Opinion will first address Mr. Dominguez's argument that the Claim was previously allowed by the Debtor's confirmed Chapter 11 Plan, before moving on to the merits of the Claim.

### A. The Claim was Not Deemed Allowed by the Confirmed Plan

Mr. Dominguez first argues that the Objection must be overruled in its entirety because the Claim was deemed allowed under § 5.7 of the confirmed Plan, which states that:

> **Class 6 Claimants (Allowed Litigation Claims)** are impaired and shall be satisfied as follows: The Class 6 Allowed Litigation Claims shall consist of any and all Claimants who, as current or former employees of the Debtor, have asserted or could have asserted claims for minimum wages, overtime pay, backpay, additional/double damages, penalties, attorneys' fees, costs and /or expenses against the Debtor arising out of any alleged violations of the Fair Labor Standards Act 29 U.S.C. §§ 201-216 ("Act"), including, without limitation, the pending case of <u>Jose Jorge Dominguez v. Campuzanos Dallas, LLC et al.</u>, case number 3:16-cv-00143-L, currently pending in the United States District Court, Northern District of Texas, Dallas Division and any other potential claimant under the Act, who has timely filed a Proof of Claim in this matter. Any Allowed Class 6 creditors will be paid in full in sixty (60) equal monthly installments commencing on the latter of the Effective Date or thirty (30) days after a final non-appealable determination of their claim has been made by the Bankruptcy Court.

Mr. Dominguez, however, overlooks the Plan's definition of "Allowed Claim," which:

> shall mean a Claim against Debtor (a) for which a Proof of Claim has been timely filed with the Court by the Bar Date, or, with leave of the Court and without objection by any party-in-interest, late-filed and as to which neither the Debtor nor any party-in-interest files an objection or as to which the Claim is allowed by Final Order of the Court, or (b) scheduled in the list of creditors, as may be amended, prepared and filed with the Court pursuant to Rule 1007(b) and not listed as disputed, contingent or unliquidated as to amount, as to which no objection to the

---

[16] In his Response, Mr. Dominguez also argued that the Claim should be allowed because the Debtor failed to schedule the Claim as "disputed;" however, he abandoned that argument at the hearing.

allowance thereof has been interposed through closing of this case, or as to which any such objection has been determined by an order or judgment which is no longer subject to appeal or certiorari proceeding and as to which no appeal or certiorari proceeding is pending.

Here, the Debtor scheduled Mr. Dominguez's Claim as contingent and timely filed an Objection to allowance of the Claim. Thus, under the plain meaning of the Plan, the Claim cannot be considered "Allowed" until entry of a final, non-appealable order liquidating the Claim. This is clearly reflected in the last sentence of Plan § 5.7, which states that an Allowed Litigation Claim will not be paid until "the latter of the Effective Date or thirty (30) days after a final non-appealable determination of their claim has been made by the Bankruptcy Court." This Memorandum Opinion is making that very determination.

## B. The Validity of the Claim

The FLSA mandates minimum wage and overtime pay requirements for employees "engaged in commerce or in the production of goods for commerce" or "employed in an enterprise engaged in commerce or in the production of goods for commerce."[17] Where it applies, the FLSA generally requires an employer to pay overtime compensation to an employee after the employee has worked over 40 hours in one week.[18]

Due to the parties' stipulation that "Campuzanos Dallas, LLC was a covered enterprise subject to the FLSA during the time that Mr. Dominguez was employed by it" (referenced earlier), the court does not need to decide the preliminary issue of whether the Debtor falls under the ambit of the FLSA. Instead, the court's analysis will focus: (1) preliminarily, on who has the burden of proof on which issues; and (2) then substantively (a) on whether Mr. Dominguez was a managerial

---

[17] 29 U.S.C. §§ 206, 207.
[18] *Id.* at § 207(a)(1).

employee exempt from the FLSA's overtime pay requirements, and (b) if not, what damages are appropriate to compensate Mr. Dominguez for the Debtor's failure to comply with the statute.

### 1. The Shifting Burden of Proof

The preliminary issue the court must address is which party bears the burden of proof. A proof of claim filed in accordance with Bankruptcy Rule 3001 is "prima facie evidence of the validity and amount of the claim."[19] Courts have often stated that this prima facie validity may be rebutted by the objecting party producing evidence "of a probative force equal to that of the creditor's proof of claim."[20] In other words, once the prima facie validity of a proof of claim under Rule 3001(f) is established:[21]

> [t]he burden of going forward with the evidence then shifts to the objecting party to produce evidence at least equal in probative force to that offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency. This can be done by the objecting party producing specific and detailed *allegations* that place the claim into dispute, by the presentation of *legal arguments* based upon the contents of the claim and its supporting documents, or by the presentation of pretrial pleadings, such as a motion for summary judgment, in which evidence is presented to bring the validity of the claim into question.

Once an objecting party comes forth with some allegations, argument, or evidence rebutting a proof of claim, the burden then lies with whichever party would normally bear such burden under relevant substantive law, which is very often the claimant.[22] Here, that law is the

---

[19] FED. R. BANKR. P. 3001(f); *see In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988).

[20] *In re Fidelity Holding*, 837 F.2d at 698; *Simmons v. Savell (In re Simmons)*, 765 F.2d 547, 552 (5th Cir. 1985); *see Southland Corp. v. Toronto-Dominion (In re Southland Corp.)*, 160 F.3d 1054, 1059 (5th Cir. 1998).

[21] *In re Wyly*, 552 B.R. 338, 379 (Bankr. N.D. Tex. 2016) (citations omitted) (emphasis added).

[22] *Raleigh v. Illinois Dep't Revenue*, 530 U.S. 15, 20 (2000) (creditors' entitlements in bankruptcy arise in the first instance from the underlying substantive law creating the debtor's obligation, subject to any qualifying or contrary provisions of the Bankruptcy Code. "'Unless some federal interest requires a different result, there is no reason why [the state] interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.' *Id.* at 55, 99 S. Ct. at 914. In this case, the bankruptcy estate's obligation to the Illinois Department of Revenue is established by that State's tax code, which puts the burden of proof on the responsible officer of the taxpayer, *see Branson, supra*, at 260–262, 213 Ill.Dec. 615, 659 N.E.2d, at 968)." *See also In re Wyly*, 552 B.R. at 378.

FLSA, under which the **employer-Debtor** bears the burden of proving as an affirmative defense that Mr. Dominguez falls outside the overtime protections of the FLSA, and to the extent the employer-Debtor fails, Mr. Dominguez bears the burden of proving that he is owed the amount claimed, each by a preponderance of the evidence.[23]

With this guidance in mind, the court returns to its analysis of the Claim. As previously explained, a proof of claim executed and filed in accordance with Bankruptcy Rule 3001 constitutes "prima facie evidence of the validity and amount of the claim."[24] As applicable here, the general requirements under Bankruptcy Rule 3001 are that the proof of claim conform substantially with the appropriate Official Form, is executed by the creditor or the creditor's authorized agent, and, if the claim is based on a writing, it attach a copy of that writing. The Claim meets these requirements. It was filed on Official Form 410, which is the official proof of claim form utilized in bankruptcy cases, and was signed by Robert Mantueffel of J.H. Zidell, P.C., Mr. Dominguez's attorney. Attached to the Claim is a copy of the Complaint that was filed with the District Court, which initiated the Lawsuit and contains information regarding Mr. Dominguez's alleged claim and the resulting damages. Moreover, and most notably, the Debtor did not object to the Claim on the basis that it lacked prima facie validity.

Accordingly, based upon its review of the Claim, the court concludes that it complies with the requirements of Bankruptcy Rule 3001 and serves as prima facie evidence of the validity and amount of Mr. Dominguez's claim against the estate.[25]

Because the Claim is afforded prima facie validity, it is the Debtor's burden to rebut that validity with allegations, legal argument, or evidence "at least equal in probative force to that

---

[23] *Meza v. Intelligent Mexican Marketing, Inc.*, 720 F.3d 577, 581-82 (5th Cir. 2013); *Beliz v. W.H. McLeod & Sons Packing Co.*, 765 F.2d 1317, 1130 (5th Cir. 1985).

[24] FED. R. BANKR. P. 3001(f).

[25] *Id.*

offered by the proof of claim and which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency."[26]  In this regard, the employer-Debtor argues that, as a salaried, managerial employee, Mr. Dominguez was exempt from the FLSA's overtime pay requirements, the issue the court will now address.

### 2. The Managerial Exception to the FLSA

As previously explained, § 207(a)(1) of the FLSA requires employers to pay overtime compensation  (generally one and one-half time) for any hours worked by employees in excess of forty hours per week.[27]  The statute, however, offers exceptions from the overtime pay requirement, including an exemption for "any employee employed in a bona fide executive, administrative, or professional capacity."[28]  FLSA exemptions, however, are to be construed narrowly against the employer.[29]

The FLSA itself does not set out the specific requirements of these exemptions, but delegates authority to interpret the statute and define its exemptions to the Secretary of the U.S. Department of Labor.[30]

In that regard, the Department of Labor has enacted regulations (the "**Regulations**") that clarify whether an employee is exempt as "employed in a bona fide executive, administrative, or professional capacity" under 29 U.S.C. § 213(a)(1), breaking the analysis into two prongs.[31]  Under the first prong, referred to as the "salary test," the employee must be paid on a salary basis at least

---

[26] *In re Wyly*, 552 B.R. at 375 (citing cases).

[27] 29 U.S.C. § 207(a)(1).

[28] *Id.* at § 213(a)(1).

[29] T*yler v. Union Oil Co. of Cal.*, 304 F.3d 379, 402 (5th Cir. 2002) (citing *Dalheim v. KDFW–TV*, 918 F.2d 1220, 1224 (5th Cir. 1990)).

[30] *Auer v. Robbins*, 519 U.S. 452, 456 (1997).

[31] The Regulations that are promulgated by the Secretary of Labor pursuant to an express grant of authority from Congress under the FLSA are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary to the statute.  *See Freeman v. Nat'l Broad. Co.*, 80 F.3d 78, 82 (2d Cir. 1996) (citing *U.S. v. Nixon*, 418 U.S. 683, 695 (1974); *Chevron v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 843–44 (1984)).

$455 per week.[32]  An employee is considered to be paid on a salary basis if he "regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount" that is not subject to deductions based on the "quality or quantity of the work performed."[33]  Subject to certain exceptions, the employee must receive "the full salary for any week in which the employee performs any work without regard to the number of days or hours worked."[34]  Neither party disputes that the salary test is met.

As to the second prong, the employee must also: (1) have "management" as his "primary duty;" (2) "customarily and regularly direct[ ] the work of two or more other employees;" and (3) have either "the authority to hire or fire other employees" or whose suggestions on "hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."[35]  The Regulations go on to explain that "management" may include, but is not limited to, activities such as:[36]

> interviewing, selecting, and training of employees; setting and adjusting their rates of pay and hours of work; directing the work of employees;... appraising employees' productivity and efficiency for the purpose of recommending promotions or other changes in status; handling employee complaints and grievances; disciplining employees; planning the work; determining the techniques to be used; apportioning the work among the employees; determining the type of materials, supplies, machinery, equipment or tools to be used or merchandise to be bought, stocked and sold;...providing for the safety and security of the employees or the property; [and] planning and controlling the budget....

---

[32] 29 C.F.R. § 541.100(a)(1).

[33] *Id.* at § 541.602(a).

[34] *Id.* at § 541.602(a).

[35] *Id.* at § 541.100(a)(2–4).

[36] *Id.* at § 541.102.

The Regulations state that "'primary duty' means the principal, main, major or most important duty that the employee performs."[37] When determining the primary duty of an employee, the factors to be considered include, but are not limited to:[38]

> the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Although the amount of time spent is only a "useful guide" and not dispositive, "employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement."[39]

After considering all of the evidence, the court concludes that management was not Mr. Dominguez's primary duty. Some testimony was presented that Mr. Dominguez had keys to the restaurant, would open or close the restaurant, would order produce from pre-selected vendors when needed, and had input on menu items. The bulk of the record, however, clearly shows that Mr. Dominguez spent the vast majority of his day preparing and/or cooking food. He did not interview prospective employees, he had no input on who was hired as kitchen staff, and he had no input on the salaries or schedules of other employees in the kitchen. Instead, the record shows that those responsibilities fell on Mr. Jorge Vasquez, the individual who truly managed the kitchen. Although the amount of time that Mr. Dominguez spent cooking is not dispositive, the Debtor has introduced no evidence that Mr. Dominguez's "primary duty" was, in fact, management.[40]

---

[37] *Id.* at § 541.700(a).

[38] *Id.*

[39] *Id.* at § 541.700(b).

[40] *Compare Garcia v. Pancho Villa's of Huntington Vill., Inc.*, 2011 WL 1431978, at *3 (E.D.N.Y. Apr. 14, 2011) (finding employee was not exempt under FLSA when his primary duty was cooking and there was no evidence that he had management duties or had the authority to hire and fire employees) *with Coberly v. Christus Health*, 829 F.Supp.2d 521, 529–30 (N.D. Tex. 2011) (holding that senior chef was an exempt employee when he procured food

Moreover, the fact that Mr. Dominguez may have supervised the kitchen when Mr. Vasquez was off is insufficient for him to be considered a bona fide executive because, as explained by the Regulations, "[a]n employee who merely assists the manager of a particular department or supervises two or more employees only in the actual manger's absence does not meet this [managerial] requirement."[41]

Based on this record, the court concludes that Mr. Dominguez was not an "employee employed in a bona fide executive capacity" within the meaning of § 213(a)(1) of the FLSA. Accordingly, the Debtor has failed to establish, by a preponderance of the evidence, its affirmative defense that a managerial exemption to the FLSA applied to Mr. Dominguez, leaving only the issue of damages for the court to decide.

### 3. Damages

An employer who violates the FLSA's overtime requirements is "liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages," as well as reasonable attorneys' fees to be paid by the defendant and the costs of the action.[42] The plaintiff must make a prima facie case for his entitlement to damages, at which point "the burden shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence."[43]

---

supplies and kitchen equipment, planned meals, directed and supervised the operation of kitchen staff, and interviewed and recommended the hiring of food service workers).

[41] 29 C.F.R. § 541.104 (c).

[42] 29 U.S.C. § 216.

[43] *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005) (citing *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 687-88 (1946)).

### a. The Debtor's Failure to Maintain Time Records

Before calculating damages, however, the court must address the Debtor's failure to maintain adequate records of the hours Mr. Dominguez worked as a cook at Compuzanos.

Employers covered by the FLSA must "make, keep, and preserve" records of the wages and hours of their employees.[44] As explained in the Regulations, these records must include, among other things, "the time of day and day of week on which the employee's workweek begins," "hourly rate of pay for any workweek in which overtime compensation is due," "the monetary amount paid on a per hour, per day, [or] per week ... basis," the "hours worked each workday and total hours worked each workweek," "total daily or weekly straight-time earnings or wages due for hours worked ... exclusive of premium overtime compensation" and "total premium pay for overtime hours."[45]

As previously explained, the employee bears the initial burden of proving entitlement to damages.[46] If the employer keeps accurate records, the employee need only obtain and produce those records to satisfy his burden.[47] On the other hand, "where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes," the employee can meet the initial burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."[48] This burden "is not high," and an employee can meet it "through estimates based on his own recollection."[49] If he does so,[50]

---

[44] 29 U.S.C. § 211(c).

[45] 29 C.F.R. § 516.2(a).

[46] *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (citing *Anderson*, 328 U.S. at 687–88).

[47] *Id.*

[48] *Id.* (quoting *Anderson*, 328 U.S. at 687–88).

[49] *Id.*

[50] *Id.* (quoting *Anderson*, 328 U.S. at 687–887).

> [t]he burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negate the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

Turning to the case at hand, neither party disputes that the Debtor failed to keep time records reflecting the hours that Mr. Dominguez worked as a cook for Compuzanos. For example, there was no system in place for Mr. Dominguez to "clock" in and out. Thus, the court finds that the Debtor violated the provisions of the FLSA requiring that such records be kept. Because of this, Mr. Dominguez need only produce sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. This evidence is comprised of testimony from various current and former employees regarding Compuzanos' hours of operation and Mr. Dominguez's testimony as to when he would arrive to and depart from the restaurant.

Mr. Dominguez's testimony was sufficiently credible to permit this court to make a just and reasonable inference that he consistently worked an average of 71 hours per week for 67 weeks consecutive weeks.

### b. Calculating Mr. Dominguez's Overtime

Under 29 U.S.C. § 207(a), "no employer shall employ any of his employees...for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of [forty hours] at a rate not less than one and one-half times the regular rate at which he is employed." The term "regular rate" is not defined by statute, but the Regulations explain that:[51]

> If the employee is employed solely on a weekly salary basis, the regular hourly rate of pay, on which time and a half must be paid, is computed by dividing the salary by the number of hours which the salary is *intended* to compensate. If an employee is hired at a salary of $350 and if it is understood that this salary is compensation for a regular workweek of 35 hours, the employee's regular rate of pay is $350

---

[51] 29 C.F.R. § 778.113(a) (emphasis added); *accord Dacar v. Saybolt, L.P.*, 914 F.3d 917, 929 (5th Cir. 2018).

divided by 35 hours, or $10 an hour, and when the employee works overtime the employee is entitled to receive $10 for each of the first 40 hours and $15 (one and one-half times $10) for each hour thereafter.

Thus, the initial question is the number of hours that Mr. Dominguez's salary was intended to compensate.

Mr. Dominguez urges this court to adopt the "fixed" or "standard" method of calculating a salaried employee's regular rate of pay. Under this method, the court would divide Mr. Dominguez's weekly salary by 40 hours to arrive at his regular hourly rate of pay. For any hours worked over 40, the court would multiple that hourly rate by 1.5. For example, if Mr. Dominguez was paid $750 in a given week and worked 71 hours, the overtime compensation owing to him would total $871.88 (($750/40) x 1.5 x 31). In support of his argument that a 40-hour workweek was intended, Mr. Dominguez cites the court to Debtor's Exhibit A, the "compensation detail" regarding his wages. For July 19, 2014 through November 15, 2014, the hours worked per pay period are shown as "0."[52] Beginning the pay period of November 22, 2014, however, the weekly hours worked were changed from "0" to "40," which Mr. Dominguez argues proves that the parties intended a 40-hour workweek.

At the Hearing, however, Michael Case, Compuzanos' general manager, credibly testified that it was not the Debtor who inserted the 40-hour figure into Exhibit A. Instead, the Debtor would check the "salary" box for Mr. Dominguez on its internal paperwork (Claimant's Ex. 3) and it was the Debtor's payroll company, Paragon, that chose an "arbitrary" 40-hour workweek for all salaried employees.[53] Thus, the court finds there is no evidence in the record indicating that the parties intended Mr. Dominguez's salary to cover only a 40-hour workweek.

---

[52] Debtor's Ex. A at 1.

[53] Hr'g Audio Tr. 3:48:43–3:49:25 (Case testifying that the Debtor did not designate Dominguez as working a 40-hour week—that was an "arbitrary" number inserted by Paragon). *Compare* Claimant's Ex. 3 at 5 (company-prepared Input Worksheet for the paycheck issued 10/31/15, which contained no information on hours worked but instead

To the contrary, the record shows that non-salaried cooks were paid between $8 to $11 per hour and would rarely work overtime because the kitchen was adequately staffed.[54] Had these cooks worked overtime, the time-and-a-half rate would have been between $12 to $16.50 per hour, significantly below the overtime rate requested by Mr. Dominguez. The only plausible explanation for this pay discrepancy is that Mr. Dominguez's salary was intended to cover all hours worked during a workweek. Accordingly, the court concludes that using the "fixed" or "standard" method of calculating Mr. Dominguez's regular rate of pay is inappropriate.

Although not urged by Mr. Dominguez, the Regulations give an alternative to the fixed or standard method of calculating an employees' regular rate of pay to be used in situations where there is no fixed number of hours the employee is expected to work and the salary remains consistent regardless of how many, or how few, hours of work are performed in a pay period. In that instance, the workweek may fluctuate and the regular rate of pay is determined by the fluctuating workweek method ("**FWW**"). Under this method:[55]

> [t]he regular rate of pay is determined by examining each week individually and dividing the salary paid by the number of hours actually worked because the salary was intended to compensate whatever number of hours that happened to be.

A key difference between the two methods is that, under the FWW method, the overtime rate is one-half instead of one and one-half times the regular rate. Mr. Dominguez's counsel brought this method of calculation to the court's attention during closing argument.[56]

---

checked a box indicating Dominguez was paid a salary) *with* Debtor's Ex. A at 2 (Paragon prepared Compensation Detail for the same period indicating Dominguez worked 32 hours, which reflects his final workweek minus the last day of the pay period for which he was no longer employed).

[54] Debtor's Ex. B; Hr'g Audio Tr. 10:56:40-10:56:59 (former employee, Geraldo Salinas, testifying that he requested overtime but was denied because the restaurant was adequately staffed).

[55] *Hills v. Entergy Ops., Inc.*, 866 F.3d 610, 614 (5th Cir. 2017).

[56] Hr'g Audio Tr. at 4:19:00 – 4:20: (Manteuffel: "We pled [the suit] as a time-and-a-half case, but it would certainly be within the court's purview if the court felt it was more appropriate under the facts of this case and the law that it would be a half-time case in which case the damages estimate would be significantly less.").

There are four prerequisites for use of the FWW method:[57]

(1) the employee's hours must fluctuate from week to week;

(2) the employee must receive a fixed salary that does not vary with the number of hours worked during the week (excluding overtime premiums);

(3) the fixed amount must provide compensation every week at a regular rate at least equal to the minimum wage; and

(4) the employer and employee must share a clear mutual understanding that the employer will pay the fixed salary regardless of the number of hours worked.

First, as alleged in the Complaint attached to his Claim, Mr. Dominguez worked *on average* 71 hours per week,[58] a figure calculated from his memory after he was terminated. Although the court found Mr. Dominguez's testimony credible in this regard, there is nothing in the record indicating that those hours did not (or could not) fluctuate based on the level of business at Compuzanos, closing activities at the restaurant taking longer or shorter than usual, or Mr. Dominguez's personal need for time off or to come in later or earlier than usual. In fact, during opening argument, Mr. Dominguez's counsel stated that his hours varied between 74-76 hours per week, admitting to the fluctuation.[59] Thus, the first factor is met.

As to the second factor, the record clearly shows that Mr. Dominguez received a fixed salary that did not vary other than when he received a raise. Thus, this factor is met.

The third factor is also met. When Mr. Dominguez's weekly salary is divided by 71 hours, it never falls below the Federal minimum wage requirement for the relevant period.

---

[57] *Dacar*, 914 F.3d at 924 (citing cases).

[58] *Compare* Complaint ¶ 18 ("Plaintiff worked an average of 71 hours per week….") *with* Hr'g Audio Tr. 10:15:40-10:16:35 (Mr. Dominguez's counsel stating time worked at 74-76 hours per week).

[59] Hr'g Audio Tr. at 10:15:35-10:16:35.

Turning to the fourth factor, the question of whether an employer and employee agree to a fixed weekly wage for fluctuating hours is a question of fact.[60] In making this determination:[61]

> [t]he parties' initial understanding of the employment arrangement as well as the parties' conduct during the period of employment must both be taken into account in determining whether the parties agreed that the employee would receive a fixed salary as compensation for all hours worked in a week, even though the number of hours may vary each week.

The court concludes that the fourth factor is met for several reason.

First, although Mr. Dominguez and his manager did not discuss whether his salary would cover all hours worked, he was told upfront that the Debtor did not wish to pay him any overtime.[62] Second, Mr. Dominguez consistently worked an average of 71 hours per week for 67 weeks without complaining about his hours or inquiring why he did not receive overtime pay. When asked about this at the Hearing, Mr. Dominguez explained that he expected his salary to increase over time,[63] which is what occurred.[64] Finally, the court finds it particularly persuasive that Compuzanos' other cooks were paid between $8 to $11 per hour, with the vast majority making $9 per hour.[65] If Mr. Dominguez's salary were intended to compensate a fixed, 40-hour week, his hourly rate would range between $13.75 (when he was making $500 per week) to $17.50 (when he was making $700 per week), rates significantly higher than cooks performing similar duties. The only plausible explanation for this pay discrepancy is that Mr. Dominguez's salary was intended to compensate him for all hours worked. Thus, based on this record, the court concludes that the FWW method of calculating the regular rate of pay is appropriate.

---

[60] *Hills*, 886 F.3d at 614 (citing *Black v. SettlePou, P.C.*, 732 F.3d 492, 498 (5th Cir. 2013)).

[61] *Black*, 732 F.3d at 499 (citing *Ransom v. M. Patel Enters., Inc.*, 734 F.3d 377, 386 (5th Cir. 2013)).

[62] Hr'g Audio Tr. 1:27:15 – 1:28:24.

[63] Hr'g Audio Tr. 2:35:16 – 2:36:21.

[64] Debtor's Ex. A (Compensation Detail).

[65] Debtor's Ex. B (Labor Distribution, 7/19/14 – 10/31/15) at 8.

Using the FWW method,[66] the court calculates Mr. Dominguez's damages as follows: Mr. Dominguez worked 67 weeks for the Debtor, of which he worked eight weeks at the salary of $550 per week (total $4,400 of pay); he worked 27 weeks at the salary of $650 per week (total of $17,500 of pay); and he worked 32 weeks at the salary of $700 per week (total of $22,400 of pay).[67] This totals **$44,350 of aggregate pay over 67 weeks**. If one divides $44,350 of aggregate pay over 67 weeks, this yields an average salary per week of $661.94 per week. If one divides $661.94 salary per week by a 71-hour workweek, this would reflect a regularly hourly rate of **$9.32** per hour over Mr. Dominguez's entire employment term with the Debtor, an hourly rate that happens to coincide to the hourly rate generally paid to other cooks. But Mr. Dominguez should have received additional pay for all hours worked in excess of 40 hours each week (*i.e.*, 31 hours each week). Using the FWW method to calculate overtime pay results in a half-time rate of $4.66 per hour. Thus, if Mr. Dominguez worked 31 hours of overtime for 67 weeks, this would equal 2,077 hours of overtime, which should have received $4.66 per hour more than what Mr. Dominguez received (and 2,077 times $4.66 equals $9,678.82).[68]

Mr. Dominguez's counsel urges this court to find that Mr. Dominguez's regular rate was $16.25 per hour and, accordingly, his time-and-a-half rate should be deemed $24.38 per hour—

---

[66] As explained in *Black v. SettlePou, P.C.*, 732 F.3d 492, 498 (5th Cir. 2013), the Fifth Circuit has held that 29 C.F.R. § 778.114 does not apply retroactively. Instead, courts within the Fifth Circuit rely on the Supreme Court's endorsement of the FWW method in *Overnight Motor Trans. Co. v. Missell*, 316 U.S. 572 (1942) for authority to calculate the overtime premium using the FWW half-time multiplier. *Id.* (citing cases).

[67] Debtor's Ex. A.

[68] *See Singer*, 324 F.3d at 822-23 (fire fighters argued that the district court had used the wrong divisor in computing its legally required time-and-a-half overtime, by including overtime hours in the divisor; they argued that, for all work periods at issue, the court should have divided by the maximum number of non-overtime hours that fire fighters worked; Fifth Circuit noted that, in *Lee v. Coahoma County, Mississippi*, 937 F.2d 220 (5th Cir. 1991), corrected by *Lee v. Coahoma County, Mississippi*, 37 F.3d 1068, 1069 (5th Cir. 1993), it had explained that, in determining the regular rate of pay, the district court should divide the work period salary "by the number of regular hours which may be worked in that work period" and it did not state that "regular hours" could only include non-overtime hours; rather, the Fifth Circuit stated that the term "regular hours" is more appropriately defined as the hours normally and regularly worked by an employee. Thus, the district court did not err in calculating the fire fighters' regular rate by dividing their work period salary by both non-overtime and overtime hours.).

which should be multiplied by 31 hours, times 67 weeks totaling $50,637.26. This court considers this calculation to be inconsistent with the FWW method of calculation and the guidance given by the Fifth Circuit in *Singer* and *Lee*.[69]

### 4. Liquidated Damages

Under the FLSA, a court generally awards liquidated damages equal in amount to unpaid overtime.[70] In other words, there is a doubling of actual damages. However, if an employer has a good faith belief that it is not violating the FLSA, and if that belief is based on objectively reasonable grounds, a court may in its discretion award no liquidated damages.[71] An employer seeking to avoid paying the liquidated damages bears "the plain and substantial burden of persuading the court by proof that his failure to obey the statute was both in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict."[72] It has been said that the "burden is a difficult one to meet; double damages are the norm, single damages the exception."[73]

To satisfy the good faith requirement, an employer is "obligated to demonstrate that it had an honest intention to ascertain what the FLSA required and to act in accordance with it."[74] Additionally, good faith "requires some duty to investigate potential liability under the FLSA. An employer cannot claim good faith who blindly operates without making an investigation as to its responsibilities under the law."[75] An employer must demonstrate both objective and subjective

---

[69] *See id.*

[70] *Owens v. Marstek, L.L.C.*, 548 F. App'x 966, 972 (5th Cir. 2013).

[71] *Lee*, 937 F.2d at 226.

[72] *Barcellona v. Tiffany English Pub., Inc.*, 597 F.2d 464, 468 (5th Cir. 1979).

[73] *Dalheim v. KDFW-TV*, 712 F. Supp. 533, 539 (N.D. Tex. 1989).

[74] *Id.* at 536 (citations and punctuation omitted).

[75] *Id.* (citing *Barcellona*, 597 F.2d at 469).

good faith.[76] This means making a determination of whether the failure to pay overtime compensation was objectively reasonable.[77]  In the *Dalheim* case, the court noted that trial courts have discretion to deny liquidated damages "where the employer exhibited a manifest desire to comply with the law."[78] The court in *Dalheim* denied liquidated damages since the employer there was dealing with a "particularly knotty" issue of first impression; the employer had requested its legal counsel's opinion on the issue; the firm had devoted significant attention to the issue over a several-month period; and the Department of Labor had previously investigated the employer and gave it a "clean bill of health."[79]

In this case, there is no compelling evidence that the Debtor showed a "manifest desire to comply with the overtime laws."  There was no testimony regarding the Debtor conducting personal research; that legal counsel had investigated and given advice; or that there had been any interaction with the Department of Labor or any other person with regard to this issue.  Thus, the court concludes that the Debtor failed to meet its "plain and substantial burden of persuading the court by proof that its failure to obey the statute was both in good faith and predicated upon . . . reasonable grounds."[80]  Based on the preponderance of the evidence, the court cannot find that the Debtor's FLSA violations were in good faith and that there was an objectively reasonable basis for the violations.  Accordingly, the court must award doubled, liquidated damages.

For the foregoing reasons, the Objection is overruled, in part, and the Claim is allowed in the amount of **$19,357.64**, representing **$9,678.82** in unpaid overtime wages and **$9,678.82** in

---

[76] *Id.* at 539-40.

[77] *Id.*

[78] *Id.* at 541 (citations omitted).

[79] *Id.* at 534-39.

[80] *Barcellona*, 597 F.2d at 468.

liquidated damages. And because the court has awarded Mr. Dominguez damages under the FLSA, he will also be entitled to reasonable attorneys' fees, which will be determined in a separate opinion.

Dominguez's counsel is directed to prepare a form of order, circulate it to opposing counsel for review, and upload it within 14 days of entry of this Memorandum Opinion. If the parties are unable to agree to a form of order, each party shall provide to the Courtroom Deputy its preferred from of order with an explanation of why its proposed form is proper.

### # # # END OF MEMORANDUM OPINION # # #